Dave L. PEARCE, Commissioner of Agriculture and Immigration of the State of Louisiana,

v.

Orville FREEMAN, Secretary of Agriculture of the United States of America.

Civ. A. No. 2717.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Feb. 16, 1965.

948

Joel B. Dickinson, Baton Rouge, La., Ellis C. Magee, Franklinton, La., for plaintiff.

Louis C. LaCour, U. S. Atty., Eastern Dist. of Louisiana, Norton L. Wisdom, Sp. Asst. U. S. Atty., Frederick W. Vetters, Asst. U. S. Atty., New Orleans, La., John G. Liebert, U. S. Dept. of Agriculture, Washington, D. C., Harland F. Leathers, Irwin Goldbloom, Dept. of Justice, Washington, D. C., of counsel, for defendant.

WEST, District Judge.

■ This is an action brought by the Commissioner of Agriculture and Immigration for the State of Louisiana, hereinafter referred to as "Commissioner," against the Secretary of Agriculture for the United States of America, hereinafter referred to as "Secretary," seeking an injunction restraining the Secretary from enforcing Federal Milk Marketing Order #96, 7 C.F.R. 1096. Plaintiff contends that the order exceeds the authority granted by Congress to the Secretary of Agriculture by the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C.A. § 601 et seq., which authority, plaintiff contends, is specifically limited by the provisions of 7 U.S.C.A. § 610(i), and that thus, the order is null, void and unenforceable. The Secretary defends on the grounds that (1) the complaint fails to state a claim upon which relief may be granted in that 7 U.S.C.A. § 610(i) does not limit the authority otherwise granted by the Agricultural Marketing Agreement Act to the Secretary of Agriculture insofar as the issuance of marketing orders is concerned and that (2) plaintiff has failed to show that the Secretary of Agriculture has in any way violated the provisions of 7 U.S.C.A. § 610(i) by issuing Federal Milk Marketing Order #96. Several pretrial conferences have been held in this matter and the parties were ordered by the Court to hold further conferences in an effort to resolve this dispute between the State of Louisiana and the Federal Government. Counsel for both sides have labored long and hard in an effort to amicably settle this dispute, but to no avail. After all attempts at settlement were exhausted, the matter came on for hearing before this Court, and thereafter the Court was furnished with scholarly briefs by both sides. Now, after due consideration of the record herein, the arguments and briefs of counsel, and the law applicable hereto, it is concluded that the Secretary of Agriculture for the United States of America, in issuing Federal Milk Marketing Order #96, 7 C.F.R. 1096, did not exceed the authority delegated to him by Congress when it enacted the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C.A. § 601 et seq. The sole issue involved here is whether or not marketing orders, regulating the handling of milk in interstate commerce, issued by the United States Secretary of Agriculture, must, pursuant to the provisions of 7 U.S.C.A. § 601 et seq., be "complementary" to similar orders issued by the state involved, as might be indicated by Section 610(i).

In 1955, the United States Secretary of Agriculture promulgated Federal Milk Marketing Order #96, 7 C.F.R. 1096, pursuant to authority granted by the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C.A. § 601 et seq. This order regulated, in various respects, the handling and marketing of milk in the ten parishes of Louisiana designated in the order as the "Northern Louisiana Marketing Area," and being the Parishes of Bossier, Caddo, Claiborne, DeSoto, Lincoln, Morehouse, Ouachita, Red River, Union, and Webster. This order was very comprehensive and regulated just about every aspect of milk marketing in that area, including, among other things, the classification of milk produced by the producer, its utilization by the handler, and the price to be paid by the handler to the producer for his milk. The price to be paid a producer for his milk is determined by the use to which a handler puts the milk, with milk for fluid use, called Class I utilization, bring a higher price than milk used in the manufacture of other products such as butter, cheese, and ice cream, called Class II utilization. Order #96, as originally promulgated in 1955, provided for payments by the handler, or user of the milk, to the producer or dairyman by the use of what is known as an individual handler pool arrangement. Under this arrangement a producer is paid for his milk by the handler to whom he sells it on the basis of the utilization by that particular handler of the milk purchased from that producer. For example, if Producer A sells all of his milk to Han-

dler B, who uses all of Producer A's milk in fluid form, i. e., Class I utilization, and the price set for Class I utilized milk is $6.00 per cwt., Handler B must pay Producer A $6.00 per cwt. for all milk he purchases from Producer A. If Producer C sells his milk to Handler D and Handler D uses 80 per cent of the milk in fluid form (Class I utilization) and uses the other 20 per cent for manufacturing butter, cheese, etc. (Class II utilization), and if the price set for milk used as Class II utilization is $3.00 per cwt., Producer C would receive only $5.40 per cwt. for all of the milk he sells to Handler D. This is called the "Blend Price" and is arrived at by applying the percentage of Class I utilization of Producer C's milk to the price of that milk, and applying the percentage of Class II utilization of Producer C's milk to the price of that milk, and adding the two results together. This, of course, means a producer who sells milk to a handler who has a higher Class I utilization receives more for his milk than does a producer who sells to a handler with a lower Class I utilization, even though the milk sold by the two producers is of equal grade and quality. In other words, the amount received by a producer for his milk is entirely dependent upon the utilization of the milk by the particular handler to whom it is sold.

This method of determining the price to be paid a producer remained in effect under Federal Milk Marketing Order #96 until it was amended in June of 1962. But in the meantime, the Legislature of Louisiana, in 1958, passed Act 193 of 1958, known as the "Orderly Milk Marketing Act," which act authorized, inter alia, the Commissioner of Agriculture and Immigration of Louisiana to regulate the prices to be paid the dairymen, or producers, by the handlers for their milk. In December, 1960, pursuant to the authority granted by this act, the Commissioner promulgated State Orders #2 and #3, which orders covered the marketing of milk in all of its ramifications in 57 parishes of Louisiana, including the ten parishes covered by the Federal Order #96. All of the provisions of the State Order were essentially the same as those of the Federal Order, including the use of a Handler Pool Arrangement, except that the minimum prices provided for in the State Order were higher than those provided for in the Federal Order. This difference in prices caused no difficulty as both were minimum rather than maximum prices.

The producers and handlers operated without apparent difficulty under both of these orders until June of 1962. At that time, the Secretary amended Federal Order #96 to provide that in the ten parishes covered by that order, the use of what is known as a Market Wide Pool Arrangement would be substituted for the Individual Handler Pool Arrangement originally provided for in the order. Under a Market Wide Pool Arrangement, the average utilization by all handlers in the market area is determined. Then, a market wide blend price is determined by the same means used to determine an individual handler's blend price. Thus, when the market wide blend price is determined, some handlers will actually have a higher Class I utilization than the market average and some will actually have a lower Class I utilization than the market average. The same, of course, is true as to Class II utilization. Under this arrangement, the handler pays to the producer only the market average blend price for his milk. Then if the handler actually has a higher Class I utilization than the market average, he must pay the surplus over the market blend price into a pool called the producers' settlement fund. If, on the other hand, the handler actually has a lower Class I utilization than the market average, he still pays the market blend price to the producer, but withdraws from the producers' settlement fund the difference between the market blend price which he has paid the producer and the blend price figured on his own individual utilization. The purpose of the market wide pool arrangement is to distribute the market for Class I utilization of milk more evenly among all of the producers.

in the area involved. Since the price received for milk by the producer is determined not by its quality, but by its utilization, all producers are supposed to share more equally in the fluid milk market by the use of the Market Wide Pool Arrangement than is the case where an Individual Handler Pool Arrangement is used. But, as is apparent, the two systems are inconsistent one with the other, and consequently, since after June of 1962, the Federal Order provided for a Market Wide Pool Arrangement and the State Order provided for an Individual Handler Pool Arrangement, a handler in the area affected cannot obey one order without disobeying the other. Hence, the present controversy.

This suit was filed by the Commissioner against the Secretary asking that this Court enjoin the Secretary from enforcing Federal Order #96, as amended, in the ten parishes involved, especially insofar as it requires the use of the Market Wide Pool Arrangement on the grounds that that order is inconsistent with, and not complementary to, Louisiana State Orders #2 and #3 in that respect. The Commissioner maintains that Section 10(i) of the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C.A. § 610(i), directs the Secretary to issue orders "complementary to orders or other regulations" issued by the State, and that it thus limits, to that extent, the power of the Secretary to issue marketing orders. The Secretary contends, on the other hand, that when Congress passed the Agricultural Marketing Act it gave the Secretary extremely broad powers to regulate interstate commerce, and that Section 610(i) merely grants to the Secretary an additional power to cooperate with the states rather than in any way limiting his powers to the issuance of "complementary" orders only.

It is conceded by both parties that the marketing of milk in the ten parishes involved in Federal Milk Marketing Order #96 does constitute interstate commerce and that it is an activity which can be regulated by the United States Secretary of Agriculture if, in fact, the Congress has so ordained. Thus the sole question here involved is whether the Agricultural Marketing Agreement Act of 1937, as amended, authorizes the Secretary to regulate the marketing of milk in interstate commerce, even though such regulations as may be issued by him are in conflict with orders or regulations issued by the state, or whether the act merely authorizes the Secretary to issue only such orders as are complementary to similar orders issued by the state.

By definition, "complementary" means "serving to fill out or complete" or "mutually supplying each other's lack." Using these definitions, it is obvious that Federal Order #96 is not complementary to State Orders #2 and #3. These orders, on the contrary, are contradictory to rather than complementary of each other. They cannot exist together without forcing handlers to violate one or the other. The question is which authority, the Federal or State, is to prevail in this area.

Article, 1, Section 8 of the Constitution of the United States gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Pursuant to this constitutional grant of authority, Congress may determine if, when, or how it wishes to exercise its power to regulate interstate commerce. It may decide for itself how far, in any given instance, its regulations of interstate commerce shall go. If it chooses to circumscribe its regulations and occupy only a limited area in a given field, it leaves to the states the right to regulate outside of that limited area. In other words, where Congress chooses to limit its area of regulation, its regulations thus issued are supreme only within the limited area delineated by the Act of Congress. The remainder of the area, unregulated by Congress, even those involving interstate commerce, may be regulated by state action assuming, of course, that regulation at all is legally

permissible, and that the state regulation does not conflict with any federal regulation. Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754, 1223 (1942). Kelly v. State of Washington ex rel. Foss Co., 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3 (1937). Also, Congress may, if it sees fit, exercise its broad authority over interstate commerce alone, or in conjunction with co-ordinated action by the state. Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946). And Congress will not be deemed to have superseded or excluded state action under the Commerce Clause until its intention to do so has been made definite and clear. The intent of Congress to exert its superior authority and thus preclude or supersede state legislation covering the same subject matter is not to be lightly inferred but must be fully manifested. People ex rel. McLaughlin v. G. H. Cross Co., 361 Ill. 405, 198 N. E. 356, affirmed, Hartford Accident & Indemnity Co. v. People ex rel. McLaughlin, 298 U.S. 155, 56 S.Ct. 685, 80 L.Ed. 1099 (1936); Missouri-Kansas-Texas R. Co. v. Williamson, 36 F.Supp. 607 (D.C.Okla.1941). But where it is clear that Congress has enacted a statute to regulate a phase of interstate commerce that clearly covers the same subject matter as, or that is in direct conflict with, a state statute, such exercised power of Congress is not only supreme, but is also exclusive, superseding existing state law and excluding further regulations covering the same subject by the state. Milk Control Board of Pennsylvania v. Eisenberg Farm Products, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752 (1939). The same is of course true when the federal regulation involved is a regulation promulgated by an agency or instrumentality of the Federal Government, such as the Secretary of Agriculture, when acting pursuant to a valid grant of authority by Congress to so act. Neiswonger v. Goodyear Tire & Rubber Co., 35 F.2d 761, E.D.Ohio (1929). In the instant case, the regulations involved, Federal Milk Marketing Order #96, was issued by the United States Secretary of Agriculture pursuant to authority granted by Congress in the Agricultural Marketing Agreement Act of 1937, as amended, which Act has been clearly held to have been a constitutional exercise of the congressional power to regulate interstate commerce. United States v. Rock Royal Co-op, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939).

Thus, the question presents itself as to whether or not Congress, by passage of the Agricultural Marketing Agreement Act of 1937, as amended, undertook to invade the entire field of milk marketing insofar as it affected interstate commerce, or whether or not it intended to regulate only a limited area within the field of milk marketing, leaving to the states the remainder of the field to regulate if they saw fit.

Both parties, to this suit agree that if the entire field has in fact been validly pre-empted by Congress, the regulations of the Secretary must prevail over conflicting state regulations. But plaintiff says that 7 U.S.C.A. § 610(i) clearly shows that Congress did not intend to regulate, by itself or through government agencies, the entire field of milk marketing in interstate commerce. He argues that Section 610(i), on the contrary, specifically limits the power of the Secretary to regulate milk marketing in interstate commerce by directing the Secretary to issue orders *complementary* to orders or other regulations issued by the state. It is his position that this limitation on the powers of the Secretary renders null and void any regulation or order that he may issue which is in conflict with any order or regulation issued by the state. This argument would seem to have some validity if Section § 610(i) could stand by itself, without taking into consideration the many other provisions of the Agricultural Marketing Agreement Act.

7 U.S.C.A. § 610(i) reads as follows:

"The Secretary of Agriculture upon the request of the duly constituted authorities of any State is directed, in order to effectuate the declared policy of this chapter and in order

to obtain uniformity in the formulation, administration, and enforcement of Federal and State programs relating to the regulation of the handling of agricultural commodities or products thereof, to confer with and hold joint hearings with the duly constituted authorities of any State, and is authorized to cooperate with such authorities; to accept and utilize, with the consent of the State, such State and local officers and employees as may be necessary; to avail himself of the records and facilities of such authorities; to issue orders (subject to the provisions of section 608c of this title) complementary to orders or other regulations issued by such authorities; and to make available to such State authorities the records and facilities of the Department of Agriculture: *Provided,* That information furnished to the Secretary of Agriculture pursuant to section 608d(1) of this title shall be made available only to the extent that such information is relevant to transactions within the regulatory jurisdiction of such authorities, and then only upon a written agreement by such authorities that the information so furnished shall be kept confidential by them in a manner similar to that required of Federal officers and employees under the provisions of section 608d(2) of this title."

This section, standing alone, may *seem to indicate that the Secretary of* Agriculture can act only upon the request of a state, and then may issue only such orders as are complementary to those of the state. But a reading of the entire Agricultural Marketing Agreement Act leaves little doubt that such was not the intent of Congress.

For example, Section 602 states:

"It is declared to be the policy of Congress—

"(1) Through the exercise of the powers conferred upon the Secretary of Agriculture under this chapter, to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish, as the prices to farmers, parity prices as defined by section 1301(a)(1) of this title.

\*  \*  \*  \*  \*  \*

"(4) Through the exercise of the powers conferred upon the Secretary of Agriculture under this chapter, to establish and maintain such orderly marketing conditions for any agricultural commodity enumerated in section 608c(2) of this title as will provide, in the interests of producers and consumers, an orderly flow of the supply thereof to market throughout its normal marketing season to avoid unreasonable fluctuations in supplies and prices."

In Section 608c we find that:

"(1) The Secretary of Agriculture shall, subject to the provisions of this section, issue, and from time to time amend, orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section. Such persons are referred to in this chapter as 'handlers.' Such orders shall regulate, in the manner hereinafter in this section provided, only such handling of such agricultural commodity, or product thereof, as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof."

(2) [Here are listed products covered, including milk.]

"(3) Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of this chapter with respect to any commodity or product thereof specified in subsection (2) of this section, he shall give due notice of and an opportunity for a hearing upon a proposed order."

"(4) After such notice and opportunity for hearing, the Secretary of Agriculture shall issue an order if he finds, and sets forth in such order, upon the evidence introduced at such hearing (in addition to such other findings as may be specifically required by this section) that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this chapter with respect to such commodity."

(5) [This section sets forth in detail the terms and conditions that may be incorporated in an order issued by the Secretary regulating the marketing of milk. This section specifically authorizes the Secretary to set minimum prices to be paid by handlers to producers, and authorizes the use of either individual handler pool arrangements or market wide pool arrangements.]

The sections following this set forth in detail the many factors that may be considered by the Secretary in regulating the marketing of agricultural products which move in or affect interstate commerce.

Section 608c(15), (16), (18), and (19) provides for the procedure to be used when a handler wishes to contest an order or regulation issued by the Secretary or when the Secretary deems it necessary to alter, terminate, or suspend regulations previously issued by him, or when the Secretary deems it necessary to fix or alter minimum milk prices.

Then comes the contested Section 610(i). After reading the entire act, the purpose of this section becomes quite obvious. It is certainly not to limit the powers of the Secretary as contended for by plaintiff. To so rule would, in effect, nullify all of the remainder of the act in order to give validity to this section. But such an interpretation is not warranted, because Section 610(i) is, in fact, in harmony with the remainder of the act. All of the provisions of the act previously referred to herein permit the Secretary to act on his own initiative in issuing orders to regulate the marketing of milk and other agricultural products moving in interstate commerce. Section 610(i), on the other hand, contemplates a situation where the Secretary has not acted on his own initiative. In such a case he is directed by Section 610 (i) to act, when requested to do so by a state, in such a way as to assist the state in making its marketing orders effective. For example, suppose the Federal Government had not attempted, on its own initiative, to regulate the marketing of milk in the ten parishes involved, but that the State of Louisiana did have in effect a milk marketing order covering all or part of the State of Louisiana. Then suppose that milk was being shipped into these ten parishes, in interstate commerce, from an adjoining state which had no marketing regulations, and that the pricing of milk in the adjoining state was such as to allow it to be sold in Louisiana at a price disruptive of the orderly marketing program of the State of Louisiana. Louisiana may not be able to validly regulate this interstate commerce in such a way as to make its own marketing program effective in the area involved, but the Secretary of Agriculture, under the Agricultural Marketing Agreement Act, could. Thus, in such a situation, it would be logical for the State of Louisiana to enlist the aid of the Secretary of Agriculture under Section 610(i) in regulating the segment of milk marketing activity beyond the control of the state in order that the state's program might have maximum effectiveness. In such a case, upon request of the state, pursuant to Section 610(i), the Secretary is directed to assist the state by issuing orders in the interstate area complementary to state orders already in effect. This procedure, under Section 610(i), comes into play only in instances where, in the particular area involved, the Secretary has not seen fit to regulate marketing activities on the federal level, but acts only upon the request of the state and as an assist to the state in carrying out its marketing program. But should

the Secretary later determine, in accordance with the other provisions of the act that direct regulation by the Federal Government is necessary or advisable, his previous orders, issued under Section 610(i) on request of the state, could not preclude him from issuing such new orders in accordance with his findings, made pursuant to the other provisions of the act. And any action previously taken by him pursuant to the provisions of Section 610(i) could not, of course, prevent such later orders as are issued by him pursuant to the other provisions of the act from being supreme and from superseding state orders or regulations in the same area. In brief, by the enactment of the Agricultural Marketing Agreement Act of 1937, as amended, Congress has pre-empted the entire field of marketing of milk in interstate commerce, and has, by this act, properly delegated to the United States Secretary of Agriculture the power to promulgate orders and regulations pursuant thereto. In addition, Congress authorized and directed the Secretary to assist a state, when requested to do so, in making effective a state marketing program in instances where the Secretary did not deem it necessary, at the time, to order federal regulations in that area different from the state regulations in effect. In such an instance, the federal regulations issued at the request of the state must be complementary to the state orders as provided in Section 610(i). But the Secretary may, at any time, despite orders that he may have previously issued pursuant to Section 610(i), decide that direct federal regulation, contrary to the state program, is desirable, and in such an event, he may issue such orders as he deems necessary pursuant to the authority granted in the other sections of the Agricultural Marketing Agreement Act of 1937. If such orders are, in fact, contrary to or inconsistent with the acts or orders of the state in that area, the Secretary's orders are supreme, superseding all conflicting state orders. This is purely and simply an exercise by the United States Government of the power to regulate interstate commerce as granted by Article 1, Section 8, of the United States Constitution. The states simply cannot deprive the Congress of this constitutionally granted power.

██ This Court had some misgivings as to whether or not the State of Louisiana, through its Commissioner of Agriculture, had standing to sue the United States Secretary of Agriculture in this instance. There is a question as to whether or not such a judicial review of the orders of the Secretary is provided for in the Agricultural Marketing Agreement Act. However, this Court concluded that even though, by reference to Section 608c(15)(A) the right of judicial review seems to be limited to suits by handlers, the general equity jurisdiction of the Court authorizes it to hear a suit to enjoin the United States Secretary of Agriculture from enforcing what is alleged to be an illegal order dealing with the marketing of milk. Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733.

██ But any judicial review of an order which the Secretary has promulgated is limited to a review of the record of administrative proceedings and to a determination of whether or not such order was issued in accordance with law. Wawa Dairy Farms v. Wickard, 149 F.2d 860, (CCA3, 1945). Thus, in this case, the Court having determined from a review of the record that Federal Milk Marketing Order 96 was, in fact, issued by the United States Secretary of Agriculture in accordance with law, and there being no evidence to the contrary before the Court, plaintiff's demands for injunctive relief must be denied.

Judgment will be entered accordingly.