STATE OF MAINE                                    SUPERIOR COURT
WASHINGTON, ss.                                   CIVIL ACTION
                                                  DOCKET NO. CV-05-33

                                                  TEH-WA 12/29/05

WINIFRED B. FRENCH CORPORATION,
d/b/a THE QUODDY TIMES, ET AL

                    Plaintiff

        v.                                        DECISION AND ORDER

PLEASANT POINT PASSAMAQUODDY
RESERVATION[1],

                    Defendant


        This matter is before the court on the complaint of the plaintiffs The Quoddy

Tides and the Bangor Daily News ("Newspapers") for relief under Maine's

Freedom of Access Act ("FOAA"), 1 M.R.S. §§401 et seq., and for a declaratory

judgment.[2]   Also before the court is the Reservation's objection to evidence

submitted by the Newspapers at the November 28, 2005 trial in this matter.

---

[1] Following a joint motion of Plaintiffs at trial, the Pleasant Point Passamaquoddy Reservation (the
"Reservation") was substituted as Defendant in this action in lieu of the Passamaquoddy Tribe. 30
M.R.S.A. § 6203(6) establishes the Reservation as part of the Passamaquoddy Tribe but with its own
council. Defendant argued at sidebar and later in its post-trial brief that the Reservation should have been
joined as an indispensable party before trial, and that the Reservation's interests could be prejudiced by
being substituted for the Tribe at such a late date. However, counsel for the Tribe and the Reservation
was given the opportunity prior to the presentation of Plaintiffs' evidence to reschedule the trial for a later
date, after a formal substitution of parties had been made pursuant to M.R. Civ. P. 19, and chose not to do
so. Defendant instead reserved the right to present further evidence after the close of the trial.

[2] Count I of the Complaint is styled a "Freedom of Access Appeal" and seeks an expedited trial *de novo*
under the FOAA based upon the Reservation's denial of the Newspapers' requests to inspect and copy
certain records of the Reservation. 1 M.R.S.A. 408 (Supp. 2005). Count II seeks a declaration that
certain meetings of the Reservation Council are public proceedings under the FOAA to which the

On September 9, 2005, the Newspapers filed a two count complaint alleging that the Reservation violated the FOAA by wrongfully denying the Newspapers' requests for access to records and documents relating to the Reservation's negotiations of a lease of its land to Quoddy Bay LLC for the development of a liquefied natural gas facility ("LNG facility") (Count I), and seeking a declaration that that all meetings of the Reservation or its Council relating to the LNG facility are "public proceedings" under the FOAA and must be open to the public (Count II).[3]

A.     RESERVATION'S OBJECTIONS TO EVIDENCE OFFERED AT HEARING

The Reservation participated in the evidentiary hearing in this matter subject to a continuing objection to the relevancy of the testimony and documents offered into evidence by the Newspapers. The Newspapers sought to establish the capacity in which the Reservation was acting by reference to a similar LNG proposal brought to the Town of Harpswell, and by evidence of the likely impact such a facility would have on the public outside the borders of the tribal lands. Because the evidence was offered pursuant to a mixed fact-law question that both parties

---

Newspapers and the general public have a right of access. As such, both counts are in the nature of appeals from alleged governmental action. M.R. Civ. P. 80B; *see Baker's Table, Inc. v. City of Portland*, 2000 ME 7 at ¶11, n. 6; *see also Blethen Me. Newspapers, Inc. v. State*, 2005 ME 56, ¶¶3-6; *Bangor Publishing Co. v. Bucksport*, 1995 Me. Super. Lexis 80, ¶ 4.

[3] Count II also seeks a broader declaration that Council meetings at which "other matters not solely related to internal tribal affairs" must also be open to the public. The court concludes that this broad and non-specific claim for relief seeks an impermissible advisory opinion.

agree is central to the court's decision, *see* Part II of this opinion, *infra*, the court overrules the Reservation's objection.

B.     THE *GREAT NORTHERN PAPER* FRAMEWORK

Both parties agree that *Great Northern Paper, Inc. v. Penobscot Nation* provides the framework within which the Newspapers' claims are resolved. *See* 2001 ME 69, 770 A.2d 574. This decision lays out a four-part test for determining the applicability of state laws to the tribes that are recognized and governed by the Maine Implementing Act, 30 M.R.S. §§ 6201 et seq. *Id.* at ¶ 42. The Passamaquoddy Tribe is recognized and governed by the Act, and the Reservation, as a political subdivision of the Tribe, is also governed by it.[4] 30 M.R.S.A. § 6202.

Under the first prong of the test, the court must determine to what entities the statute at issue applies. *Id. Great Northern Paper* established that the FOAA in particular applies to "public proceedings," which are defined as "the transactions of any functions affecting any or all citizens of the State by a municipality." *Id.* at ¶ 43. Therefore, the FOAA applies to municipalities. *Id.* at 44.

Second, the court must determine whether the Reservation is acting in its municipal capacity. *Id.* Under the Maine Implementing Act, when the Reservation acts as a governmental entity, it is acting in a municipal capacity. *Id.*

---

[4] On June 24, 1996, the Passamaquoddy Tribe and the Reservation entered into an agreement whereby the Reservation was acknowledged as a political subdivision of the Tribe.

3

The third and fourth prongs of the *Great Northern Paper* test are contingent upon the outcome of the second. *See id.* It is only if the Reservation is acting as a government that the FOAA *may* apply. *See id.* And then, even when acting as a government, application of the FOAA is limited to proceedings and records that do not concern internal tribal matters. *See id.; see also* 30 M.R.S.A. 6206(1).

C.    WAS THE RESERVATION ACTING AS A GOVERNMENT?

Depending on the circumstances and the activity, a tribe may act in various distinct capacities – as a sovereign nation, a person or other entity, a business corporation, or a municipal government. *Great Northern Paper* at ¶ 41. For example, the Law Court found that the Penobscot Nation was acting as a government when it requested that the EPA and the Federal government treat it like a state. *Id.* at ¶ 44.

In the instant case, the nature of Reservation's activities is less definitive. Over a period of months in 2004, the Reservation negotiated a land lease with a company that intended to build a LNG facility on the leased land. On August 17, 2004, the Reservation voted to continue negotiations with the developer. On May 19, 2005, they reached agreement on the terms of the lease. The Reservation then sent the proposed lease to the federal government for approval, and within two weeks, on June 1, 2005, the United States Secretary of the Interior approved the lease.

4

However, the federal approval process is not yet concluded. The parties have stipulated that the developer has no right under the lease to use any portion of the Reservation's land for the LNG project unless and until it completes and files an Environmental Impact Statement with the Federal Energy Regulatory Commission ("FERC"), and obtains permits from FERC and any other applicable federal or state authority for the construction and operation of the LNG project.

From these facts alone, it is not possible to say whether the Reservation was acting in a governmental as opposed to a business capacity. The Newspapers press the point that, in its negotiations, the Reservation acted in a way that was substantially similar to the way the Town of Harpswell acted when negotiating the possibility of a lease of its land to a LNG facility developer. However, the fact that the Town of Harpswell is a municipality, and that it engaged in negotiations and vote-taking in a manner that parallels the Reservation's activities, does not mean that the Reservation could only have been acting in its governmental capacity when it performed these functions. Private landowners as well as municipalities engage in land lease negotiations, and business corporations as well as governmental entities are structured for vote-taking on important issues.

The question remains whether the Reservation used any of its quintessentially governmental powers in negotiating this lease or in having it approved. The Reservation submits that it was not acting in its governmental

5

capacity, but rather in its business capacity, and cites to a 1950 Law Court case,

*Wilde v. Inhabitants of the Town of Madison*, to elaborate on this distinction. *See*

145 Me. 83, 87-88 (Me. 1950). *Wilde* notes:

> The courts have always recognized that a town may act within the scope of its authority as a town in two capacities. One is its governmental and the other its private capacity, although the line of demarcation is often indistinct and difficult to ascertain. Speaking Generally, the public or governmental capacity of the municipal governmental agency is the discharge of acts or duties for the benefit of the general public. The private capacity is acting in its own matters, such as the acts as owner of property held for profit or advantage. In almost all affairs of local concern some indirect relation may be traced to a matter of health, safety, or other subject of governmental cognizance. The test is not the casual or incidental connection, it is whether there is a duty or an authorization under the statute.

*Id.* This distinction between the public/governmental and proprietary capacities in

which a town may act is seductive in its simplicity. Although the test

acknowledges that it is sometimes difficult to distinguish these capacities, it

suggests a clear delineation for understanding the capacity in which the

Reservation is acting in the instant case – that is, as "owner of property held for

profit" and, therefore, in its private capacity.

However, subsequent to *Wilde*, the Law Court has made clear, not only that

the common law doctrine of governmental immunity for which this distinction was

created has been abandoned, *see Davies v. City of Bath*, 364 A.2d 1269, 1272-3

(Me. 1976), but also that, with specific reference to the question of whether the

Passamaquoddy Tribe or Penobscot Nation is acting in its governmental capacity under the Implementing Act, this old distinction does not apply. *See Couturier v. Penobscot Indian Nation*, 544 A.2d 306, 309, fn. 6 (Me. 1988) (stating, "[30 M.R.S.A.] section 6206(2) does not resurrect old distinctions between 'governmental' or nonprofit and 'proprietary' or profit making functions of a municipality formerly existing under Maine sovereign immunity common law.") Further, the Maine Tort Claims Act, which has now overtaken what was the common law doctrine of sovereign immunity, creates a unitary definition of "governmental entity" which explicitly abrogates the old distinction. See 14 M.R.S.A. § 8102.[5]

The Law Court did acknowledge in *Couturier*, however, that a question exists under the Implementing Act concerning the capacity in which the Penobscot Nation or Passamaquoddy Tribe is acting, that doesn't exist for towns or school districts, etc., which are statutorily always designated as governmental entities. *See* 544 A.2d at 309, fn. 6 (stating, "section 6206(2) provides immunity under the

---

[5] This section states in pertinent part:

  2. **Governmental entity.** "Governmental entity" means and includes the state and political subdivisions as defined in subsection 3.

  3. **Political subdivision.** "Political subdivision" means any city, town, plantation, county, administrative entity or instrumentality created pursuant to Title 30-A, chapters 115 and 119, incorporated fire fighting unit that is organized under Title 13-B and is officially recognized by any authority created by statute, quasi-municipal corporation and special purpose district, including, but not limited to, any water district, sanitary district, hospital district, school district of any type, any volunteer fire association as defined in Title 30-A, section 3151, and any emergency medical service.

Maine Tort Claims Act to those functions dealing with the operation of the Tribe or Nation as a government. The Tribe or Nation is not immune when it is acting in its business capacity.")

In light of the foregoing history, the court must now attempt to define the capacity in which the Reservation was acting in this case, cognizant of the fact that the old distinctions under the common law of governmental immunity are inapplicable, yet recognizing that some functional distinction must be made. In the context of land development, the court concludes that the Reservation acts in a governmental capacity when it regulates its land, but acts in a business capacity when it merely leases the land. The latter is not a regulatory function.

The Reservation correctly offers that the entity occupying a regulatory role in this case is the federal Department of the Interior, Bureau of Indian Affairs. Under the Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1721-1735, the federal government reserved exclusive authority to regulate the alienation of tribal lands belonging to or held in trust for the Passamaquoddy Tribe. *See* 25 U.S.C. § 1724(g) ("Except as [otherwise] provided, any transfer of land or natural resources within Passamaquoddy Indian Territory... shall be void *ab initio* and without any validity in law or equity... Land or natural resources within the Passamaquoddy Indian Territory... may, at the request of the respective Reservation... be leased in accordance with 25 U.S.C. § 415."); 25 U.S.C. § 415 ("restricted Indian lands...

8

may be leased, with the approval of the Secretary of the Interior, for... business purposes.") The federal statute applies a good deal of significance to the Secretary of the Interior's role in approving a tribal lease:

> Prior to the approval of any lease pursuant to this section, the Secretary of the Interior shall first satisfy himself that adequate consideration has been given to the relationship between the use of the leased lands and the use of neighboring lands; the height, quality, and safety of any structures or other facilities to be constructed on such lands; the availability of police and fire protection and other services; the availability of judicial forums for all criminal and civil causes arising on the leased lands; and the effect on the environment of the uses to which the leased lands will be subject.

25 U.S.C. § 415. The court is mindful that the Secretary of the Interior approved the Reservation's lease less than two weeks after it was sent to the federal government. That brief time frame suggests that the Secretary did not play a substantial role in regulating the project, specifically with regard to providing an opportunity for participation in the regulatory process to the interested public outside the tribal land who might be affected by the LNG project.

This is perhaps because the proposed LNG facility is subject to comprehensive regulation by the Federal Energy Regulatory Commission ("FERC"). *See* 15 U.S.C. § 717 ("Regulation of Natural Gas Companies"). Pursuant to federal statute, FERC oversees all proposals for the construction of LNG facilities within the United States, and provides a comprehensive review process that considers environmental impacts of the proposed development and

provides numerous opportunities for public input. *See id., see also* www.ferc.gov/industries/lng.asp (describing FERC's procedure in overseeing proposals for and construction and maintenance of LNG facilities in the United States.) In particular, the FERC process requires every applicant to hold an open house with opportunities for public input prior to issuing approval of a proposed project. *See id.* If FERC concludes that the project will have limited adverse environmental impact, it then issues a draft Environmental Impact Statement ("EIS"), which it mails to all federal, state, and local agencies; public interest groups; affected landowners; libraries; newspapers; and parties to the proceeding. *See id.* Anyone wishing to comment on the draft EIS may do so, and is directed to the appropriate FERC personnel for receipt of their comments. *See id.* FERC also announces and holds public meetings after issuing the draft EIC, for the purpose of allowing interested parties to present oral comments on it. *See id.*

The federal legislation and FERC's compulsory regulatory process for approving construction of LNG facilities demonstrate that the federal government has wholly taken over the regulation of such facilities. *See e.g. Grants Dairy v. Commissioner*, 232 F.3d 8, 15 (1st Cir. 2000) (stating, "federal law may preempt state law... when a federal regulatory scheme is so pervasive as to warrant an inference that Congress did not intend the states to supplement it.") Therefore, to the extent the leased land will be regulated for compliance with environmental and

10

safety standards, the federal government, and not the Reservation, is acting in the governmental role. *See id.* Although Article VII of the lease requires the developer to submit to ongoing monitoring by the Reservation, such monitoring is merely an additional restriction on the developer's activities, and cannot, by force of this preclusive federal activity, occupy a regulatory position. *See id.*

The lease, however, indicates that the Reservation is acting in a governmental capacity with respect to taxation of the leased property. Paragraph 3.1.1(f) of the lease in effect promises the developer that the Reservation will obtain reduced taxation on the Tribe's Tribal Employment Rights Ordinance ("TERO") tax. The TERO tax is ordinarily 3% of the total gross contract price for civil works on the premises; the lease promises to reduce this tax to 1%. Paragraph 3.1.1(f), as well as a separate paragraph at 7.7 devoted to the issue of "governmental role," maintains a strict separation between the Reservation, denominated "Landlord" in the lease, and the Tribe as government authority. Nevertheless, the arrangement indicates a significant overlap in the authority of the Tribe and the Reservation in this area, enough so that the Reservation can reasonably be said to be acting as a government with respect to the issue of TERO taxation.

11

D.    IS THE RESERVATION'S EXERCISE OF ITS GOVERNMENTAL TERO TAXATION AUTHORITY SUBJECT TO THE FOAA?

The Maine Implementing Act does not contain a specific exemption from application of the FOAA for matters of tribal taxation. However, the act's general exemption from state law for internal tribal matters is applicable to such matters. *See* 30 M.R.S.A. § 6206(1)[6]. While levying taxes is not part of the illustrative list of internal tribal matters, it fairly fits under the umbrella of "tribal government." The TERO tax is levied by the Tribe on projects constructed within tribal territory. In addition, under the first circuit's test of internal tribal matters, it is apparent that the TERO tax is an internal tribal matter. *See Akins v. Penobscot Nation*, 130 F.3d 482, 486-7 (1ˢᵗ Cir. 1997); *see also Great Northern Paper*, 2001 ME 68 at ¶¶ 49 and 55. Lowering the tax is a boon to the developer, but it directly affects only the Tribe's purse; the tax is levied only on projects on tribal lands, and does not affect surrounding lands; thus on its face it does not implicate or impair any interest of the State of Maine. *See id.* Finally, it is consistent with prior legal understandings that this tax, internal to projects within the tribal lands, would be an internal tribal matter. *See id.* It is does not necessarily follow under the *Great Northern Paper*

---

[6] This section states in relevant part that the Reservation is subject to:

all the duties, obligations, liabilities and limitations of a municipality of [the State and to] the laws of the State, provided, however, that internal tribal matters, including membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income shall not be subject to regulation by the State.

tests that, because the Reservation has made the lease more attractive to the developer by contriving to lower the TERO tax on its proposed project, the Reservation's actions have an effect on members of the public outside of the borders of tribal lands by making it incrementally more likely that a LNG facility will eventually be developed at Pleasant Point. *See Great Northern Paper*, 2001 ME 68 at ¶ 55. Under the *Great Northern Paper* rationale, the Reservation's actions are not internal to the tribe only if they have a *direct effect* on members of the public outside of tribal lands. *See id.* That is not the case here.

Pursuant to M.R. Civ. P. 79(a), the Clerk is directed to enter this Order on the Civil Docket by a notation incorporating it by reference, and the entry is:

A.    As to Count I of Plaintiffs' Complaint, Judgment for Defendant;

B.    As to Count II of Plaintiffs' Complaint, It is ADJUDGED and DECLARED that, the meetings of Defendant Passamaquoddy Reservation or its Tribal Council regarding and relating to the Reservation's negotiations of a lease of its land to Quoddy Bay LLC for the development of a liquefied natural gas facility are the actions of a business corporation, not a municipality, and, thus, are not public proceedings open to Plaintiffs or to the general public within the meaning of Maine's Freedom of Access Act, 1 M.R.S. §§401 et seq; and, to the extent these meetings include matters relating to the Reservation's governmental function of taxation of the proposed development, they are internal tribal matters exempt from Maine's Freedom of Access Act.

Dated:   December 29, 2005

Thomas E. Humphrey
Chief Justice, Superior Court

FILED

JAN 0 3 2006

MARILYN E. BRALEY Clerk                    13

WINIFRED B FRENCH CORPORATION - PLAINTIFF

Attorney for: WINIFRED B FRENCH CORPORATION
BERNARD KUBETZ   - RETAINED 09/09/2005
EATON PEABODY
80 EXCHANGE ST
PO BOX 1210
BANGOR ME 04402-1210

Attorney for: WINIFRED B FRENCH CORPORATION
VISITING ATTORNEY   - RETAINED 11/20/2005
VISITING ATTORNEY

-

-   -


BANGOR PUBLISHING COMPANY - PLAINTIFF

Attorney for: BANGOR PUBLISHING COMPANY
BERNARD KUBETZ   - RETAINED 09/09/2005
EATON PEABODY
80 EXCHANGE ST
PO BOX 1210
BANGOR ME 04402-1210

Attorney for: BANGOR PUBLISHING COMPANY
VISITING ATTORNEY   - RETAINED 11/20/2005
VISITING ATTORNEY

-

-   -



vs
PASSAMAQUODDY TRIBE - DEFENDANT

Attorney for: PASSAMAQUODDY TRIBE
CRAIG E FRANCIS   - RETAINED 10/05/2005
PASSAMAQUODDY TRIBES
15 RUNNING BROOK ROAD
FALMOUTH ME 04105

SUPERIOR COURT
WASHINGTON, ss.
Docket No   MACSC-CV-2005-00033


**DOCKET RECORD**