

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-24-2002

# Cloverland Green v. PA Milk Marketing Bd

Precedential or Non-Precedential: Precedential

Docket No. 01-2210

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Cloverland Green v. PA Milk Marketing Bd" (2002). *2002 Decisions.* Paper 428.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/428

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed July 24, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 01-2210 / 01-2219

CLOVERLAND-GREEN SPRING DAIRIES, INC.

v.

PENNSYLVANIA MILK MARKETING BOARD;
BEVERLY R. MINOR, Individually
and as members of the Board;
LUKE F. BRUBAKER; J. ROBERT DERRY,
Individually and as members of the Board

THOMAS E. MCGLINCHEY; GERTRUDE GIORGINI;
SUE A. SPIGLER, ("Milk Consumers"),
        Intervenor-Plaintiffs

        Cloverland-Green Spring Dairies, Inc.,
        Appellant (No. 00-2210)

(D.C. No. 99-cv-00487)

*(Amended per Clerk's Order filed 10/3/01)

CLOVERLAND-GREEN SPRING DAIRIES, INC.;

v.

PENNSYLVANIA MILK MARKETING BOARD;
BEVERLY R. MINOR, Individually and
as chairperson of the Board;
LUKE F. BRUBAKER; J. ROBERT DERRY,
Individually and as members of the Board

THOMAS E. MCGLINCHEY; GERTRUDE GIORGINI;
SUE A. SPIGLER, ("Milk Consumers"),
        Intervenor-Plaintiffs

        Thomas E. McGlinchey, Gertrude Giorgini,
        Sue A. Spigler, Individually, and on behalf of
        milk consumers in PMMB Areas #1 and #4,
        Appellants (No. 01-2219)

*(Amended per Clerk's Order filed 10/3/01)

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 99-cv-00487)
District Judge: Honorable Sylvia H. Rambo

Argued February 5, 2002

Before: SLOVITER, and AMBRO, Circuit Judges
POLLAK,** District Judge

(Opinion filed: July 24, 2002)

        Kevin J. McKeon, Esquire
        Malatesta, Hawke & McKeon
        100 North Tenth Street
        Harrisburg, PA 17101

        Sheldon A. Weiss, Esquire (Argued)
        125 Knightsbridge Road
        Mountainside, NJ 07092

         Attorneys for Appellant/
        Cross Appellee Cloverland-Green
        Spring Dairies, Inc.

        Thomas J. Finucane, Esquire
         (Argued)
        14 North Main Street, Suite 500
        Chambersburg, PA 17201

_____

        ** Honorable Louis H. Pollak, United States District Judge for the
        Eastern District of Pennsylvania, sitting by designation.
                                  2

        D. Michael Fisher
        Attorney General of Pennsylvania
        Gwendolyn T. Mosley (Argued)
        Senior Deputy Attorney General
        Calvin R. Koons
        Senior Deputy Attorney General
        John G. Knorr, III
        Chief Deputy Attorney General
        Chief Appellate Litigation Section
        Office of Attorney General of
         Pennsylvania
        Strawberry Square, 15th Floor
        Harrisburg, PA 17120

         Attorneys for Appellees/
        Cross Appellants

        Allen C. Warshaw, Esquire (Argued)
        Duane, Morris & Heckscher
        305 North Front Street
        P.O. Box 1003, 5th Floor
        Harrisburg, PA 17108-1003

         Attorney for Appellee
        Pennsylvania Association of Milk
        Dealers

OPINION OF THE COURT

AMBRO, Circuit Judge:

The primary issue in this case is whether the dormant Commerce Clause allows a state to impose wholesale price floors that shield in-state businesses from more efficient out-of-state competitors. Under the circumstances presented here, we hold that it does not.

Federal milk marketing orders fix minimum prices (or price floors) for milk producers' sales in most of the United States. Pennsylvania, the fourth-largest milk-producing state in the nation, sets minimum producer prices above the federal floors. To compensate its dealers[1] and retailers

_____

1. Milk dealers (i.e., processors) buy raw milk from producers (i.e., dairy farmers), process it, and sell it at wholesale prices to retailers (e.g., supermarkets, convenience stores).

for paying higher raw milk costs, Pennsylvania enforces minimum prices for wholesale and retail milk sales. The wholesale and retail price floors, which are designed to "best protect the milk industry of the Commonwealth," are fixed according to in-state milk dealers' and retailers' costs to guarantee them desirable profits. As a consequence, wholesale and retail milk prices in Pennsylvania are considerably higher than the prevailing prices in neighboring states, none of which imposes price controls. Out-of-state milk dealers want to compete in the Pennsylvania market by offering prices below the wholesale floors, but face criminal penalties for doing so.

Cloverland-Green Spring Dairies, Inc. ("Cloverland"), a Maryland milk dealer, sued the Pennsylvania Milk Marketing Board (the "Board") under 42 U.S.C.S 1983, seeking declaratory and injunctive relief with respect to the minimum wholesale prices.[2] Three milk consumers who live in Pennsylvania (Thomas McGlinchey, Gertrude Giorgini, and Sue Spigler) intervened to challenge Pennsylvania's minimum retail prices. The Pennsylvania Association of Milk Dealers (the "Pennsylvania Milk Dealers"), which represents milk dealers within the Commonwealth, intervened to help defend the minimum wholesale prices. The District Court granted summary judgment for the defendants with respect to both the wholesale and retail price floors, prompting this appeal. We affirm the Court's ruling on the minimum retail prices, but reverse its ruling on the minimum wholesale prices and remand for further proceedings.

I. Background

Because we are at the summary judgment stage, we describe the facts in the light most favorable to Cloverland,

_____

2. As a state agency, the Board is immune from suit under the Eleventh Amendment. See Fla. Dep't of Health & Rehabilitative Servs. v. Fla.

Nursing Home Ass'n, 450 U.S. 147, 150 (1981) (per curiam). But its three members, whom Cloverland also sued, are not. See Ex parte Young, 209 U.S. 123, 159-60 (1908). For simplicity, we use the "Board" to refer to its members.

the non-moving party. See Schnall v. Amboy Nat'l Bank, 279 F.3d 205, 209 n.1 (3d Cir. 2002).

In most parts of the United States, producer-to-dealer milk sales are subject to price floors imposed by the federal government. Under the federal regulatory scheme, see 7 U.S.C. S 608c; 7 C.F.R. S 1001.1 et seq., the Secretary of Agriculture divides the country into geographic regions and issues milk marketing orders that set minimum producer prices for each region. Prices are set at levels that "insure a sufficient quantity of pure and wholesome milk to meet current needs and further to assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs." 7 U.S.C. S 608c(18).3 Congress first authorized the Secretary to set minimum producer prices in 1937, amidst widespread fear of a milk shortage. Today, more than six decades later, dairy farmers across the United States produce far more milk than our country consumes.

Pennsylvania's dairy industry is among our nation's most productive. Milk production in the Commonwealth outpaces consumption by roughly 350%. Annual production per-capita is around 900 pounds; consumption per-capita is merely 200 pounds. Only three states (California, Wisconsin, and New York) produce more milk than Pennsylvania.4

_____

3. Beyond inflating prices, the federal floors protect milk producers by eliminating revenue disparities unrelated to efficiency. Milk producers are paid different prices according to the use to which their milk is put. Fluid milk (for example, milk sold in containers) commands the highest price; milk used to make other dairy products, such as cheese and butter, sells for less. To encourage producers to sell milk without regard to its use, the federal scheme pays each milk producer a "blend price" based on the aggregate uses of raw milk within his region. See West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 189 n.1 (1994); Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Resources, 232 F.3d 8, 12 (1st Cir. 2000).

4. See USDA, Federal Milk Market Administrator, Marketing Service Bulletin: 2001 Milk Production (Feb. 2002), http://fmmacentral.com/ PDFdata/msb0202.pdf (visited July 16, 2002). In addition, the Commonwealth ranks eleventh in both production per capita and production per cow. Id.

Nonetheless, to "best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and

wholesome milk to [its] inhabitants," Pennsylvania forces its milk producers to sell at "over-order" prices--meaning prices above those required by federal milk marketing orders--and, unlike any other state in the region, sets minimum prices for wholesale and retail milk sales. 31 Pa. Cons. Stat. Ann. S 700j-801 (2002). The animating statute is the Pennsylvania Milk Marketing Law (the "Milk Law"), originally enacted in 1934, before the federal government began regulating dairy farmers' prices. See Finucane v. Pa. Milk Mktg. Bd., 582 A.2d 1152, 1153 n.1 (Pa. Commw. Ct. 1990). Pursuant to the Milk Law, the Board divides Pennsylvania into six "milk marketing areas" and sets minimum prices therein, based on "conditions affecting the milk industry in each milk marketing area," i.e., the respective costs of "producers, dealers and stores in the area." S 700j-801. The Board fixes "over-order" producer prices at levels that guarantee Pennsylvania milk producers "a reasonable return." Id. Neighboring states, in contrast, do not impose minimum producer prices, apparently deeming the federal price floors sufficiently protective of their milk supplies.

To compensate dealers (and, in turn, retailers) for paying higher raw milk prices, the Commonwealth fixes wholesale and retail price floors at levels that guarantee them, also, "a reasonable return," which the Milk Law defines as"not less than a two and one-half percent (2 %) nor more than a three and one-half percent (3 %) rate of return based on net sales." Id. As a result, Pennsylvania dealers currently reap profits of around 3.3% of net sales, whereas net resale margins for dealers' sales in other states are typically around 1-2%. Persons who sell (or offer to sell) milk at prices below those dictated by the Board are subject to criminal penalties, including imprisonment. 31 Pa. Cons. Stat. Ann. SS 700j-1001, -1002 (2002).

Pennsylvania's price control regime is virtually without peer. Only two other states (North Dakota and Maine) impose resale price floors. But unlike Pennsylvania, North Dakota and Maine do not require their milk control agencies to set price floors, instead giving them the option

6

to do so.5 Everywhere else in the United States, wholesale and retail milk prices are determined by market forces, not government fiat.

The five southeastern and ten south-central counties in Pennsylvania (Areas 1 and 4, respectively, under the Board's regime) are part of the Northeast federal milk marketing region,6 which meanders from northern Virginia through New Hampshire and Vermont.7 7 C.F.R. S 1001.2 (2002). Evidence indicates that milk dealers in the states bordering Pennsylvania have the ability to sell fluid milk to retailers located as far as 150 miles away from their processing plants. According to a study the Board conducted in 1992, when the Pennsylvania Milk Dealers asked it to assess the threats posed by out-of-state dealers,

at least seventeen out-of-state dealers are capable of selling milk to Pennsylvania retailers. However, while substantial interstate movement of milk occurs within other parts of the Northeast region, out-of-state dealers do little business in Pennsylvania.

Cloverland, which is based in Baltimore, profitably sells wholesale milk in Maryland at prices well below the minimum prices applicable to sales in Areas 1 and 4. In the absence of the wholesale price floors, Cloverland would offer similarly low prices to retailers in those areas. It has tried to gain customers in Areas 1 and 4 by competing based on non-price criteria, such as packaging, quality, and service, but has been unsuccessful. Cloverland maintains that the only way it can attract business in Pennsylvania is by offering lower prices. It offered evidence that it is almost impossible for dealers to acquire business in Pennsylvania without offering milk at lower prices because there is little (if any) difference among dealers with respect to factors other than price.

_____

5. Both states' agencies exercise the option.

6. Other areas within the Commonwealth are not subject to federal producer price floors. Only the minimum prices for Areas 1 and 4 are at issue in this case.

7. Cloverland challenges not only the Milk Law, but also two orders issued pursuant thereto (Orders A-890A and A-900) that set minimum prices for Areas 1 and 4, respectively. For convenience, we also refer to the statute and the orders collectively as the "Milk Law."

It is unclear why Cloverland is able to offer prices well below Pennsylvania's wholesale floors. Perhaps out-of-state dealers can acquire raw milk at lower prices because their home states do not impose "over-order" prices, as one of the defendants' affiants indicated. On the other hand, Cloverland suggests that "large producer cooperatives" may render raw milk prices in neighboring states nearly as high as those dictated by law in Pennsylvania. So perhaps out-of-state dealers process milk more efficiently than their Pennsylvania counterparts, as Cloverland contends. Whatever the reason, it is apparent that the minimum wholesale prices prevent Cloverland from using its competitive advantage in price to attract business in Pennsylvania. At the same time, there is no evidence that any in-state dealer wants to sell milk in Pennsylvania at lower prices; indeed, the Pennsylvania Milk Dealers intervened in this case to help defend the price floors.

In an effort to justify the wholesale price floors, the defendants offered evidence, in the form of affidavits from representatives of the Pennsylvania milk industry, that the Commonwealth's "over-order" producer prices are needed to prevent "predatory pricing" that could cause a milk shortage, and that the minimum wholesale prices are

necessary to compensate dealers for paying higher raw milk prices. Cloverland countered with evidence that"for many decades" the federal producer price floors have yielded an ample milk supply in other states within the Northeast milk marketing region, none of which has wholesale or retail price floors. Further, Cloverland offered evidence that Pennsylvania's minimum wholesale prices are much higher than is necessary to keep reasonably efficient dealers in business. For instance, Cloverland presented evidence, which the defendants did not dispute, that efficient milk dealers can profitably sell milk for thirty cents per gallon less than the minimum wholesale prices.8

_____

8. This evidence showed that while dealers spend around twenty-six cents per gallon to process raw milk and transport it for sale, Pennsylvania's price floors inflate dealers' margins (the difference between raw milk costs and wholesale milk prices) to fifty-seven cents per gallon.

To put this in perspective, in May 2002, the minimum wholesale prices in Areas 1 and 4 were $2.66 and $2.64 per gallon, respectively.9 The defendants maintain that the wholesale price floors appear excessively high only because the Board bases them on dealers' average total costs, which include both average variable costs (such as raw milk, processing, labor, and transportation) and average fixed costs (such as equipment, office space, and other "overhead" expenses).10 However, this practice of fixing prices based on average total costs significantly increases dealers' profits because it will be in their economic interest to sell additional units of milk at any price above their average variable costs, even if below their average total costs. Outside Pennsylvania, in contrast, milk dealers generally offer prices based on their average variable costs.

With the record in this state, the parties filed cross-motions for summary judgment, and the District Court issued the first of two opinions. After reviewing the record, the Court determined that, because of the minimum wholesale prices, "[m]ore efficient out-of-state firms with lower costs are prohibited from utilizing their competitive advantage and attracting new customers by offering milk at lower prices." 138 F. Supp. 2d 593, 610 (2001). Further, "the clear effect produced on interstate commerce is that less out-of-state milk passes across the Pennsylvania border to be sold in Pennsylvania than would in the absence of the [Milk Law]." Id. Nevertheless, the Court deemed the burden on interstate commerce merely "incidental," reasoning that the minimum prices do not burden out-of-state dealers, but instead burden more efficient dealers without regard to location. Id. at 607.

_____

9. See Pennsylvania Milk Marketing Board, Minimum Wholesale/Retail Prices - May 2002, http://sites.state.pa.us/PA_Exec/Milk/wr200205.pdf (visited July 16, 2002).

10. See Philip Areeda & Donald F. Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697, 700 (1975) (explaining that "[f]ixed costs are costs that do not vary with changes in output," whereas variable costs "are costs that vary with changes in output"). Average total cost is calculated by dividing total production expenses (both fixed costs and variable costs) by units of output. Id.

9

Therefore, the Court applied the balancing test formulated in Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970), viz., "[w]here [a] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

The District Court appeared ready to invalidate the price floors under Pike, stating that while the burden on interstate commerce was "clear," no legitimate local benefits were evident. 138 F. Supp. 2d at 610-12. It noted that "the federal minimum pricing is ensuring an adequate supply of milk." Id. at 611. Further, the defendants offered no evidence that the wholesale price floors were necessary to avoid a milk shortage, especially since "much more milk is produced in Pennsylvania than is consumed in Pennsylvania." Id. However, the Court put off deciding whether the price floors fail the Pike test to give the parties thirty additional days to supplement the record. 11 Id. at 612.

Based on evidence subsequently introduced into the record, the District Court concluded that the wholesale price floors had some legitimate local benefits and that they burden interstate commerce less than it previously thought. Id. at 622. Relying on Pennsylvania milk industry representatives' statements that the wholesale price floors are necessary to compensate dealers for paying "over-order" producer prices, the Court determined that the minimum wholesale prices advance the legitimate local interest in averting a milk shortage. Id. at 621-22. Although there was considerable evidence that "Pennsylvania produces more milk than its inhabitants drink and neighboring states have been able to maintain adequate supplies of milk without state-mandated prices," this did not prove "that the putative local benefits are non-existent or that the legislature could not have believed in the purported purpose of the statute." Id. at 622.

11. Having just granted the Pennsylvania Milk Dealers' motion to intervene, the District Court wanted to give them an opportunity to introduce evidence regarding the price floors' legitimate local benefits.

10

On the burdens side of the scale, the Court reasoned that out-of-state dealers' ability to compete based on non-price criteria rendered the burden on interstate commerce "minimal," and that Cloverland "offer[ed] no conclusive evidence" that the minimum wholesale prices "substantial[ly]" reduce the flow of milk into Pennsylvania. Id. at 623. The Court relied heavily on statements by four Pennsylvania dealers and twenty-two Pennsylvania retailers that dealers compete based on non-price criteria, such as quality, service, and packaging. Id. It did not mention that many of the retailers listed price as an important factor-- indeed, a number called it the most important--in deciding whether to switch dealers. Nor did it mention that several retailers explicitly said that, were it not for the minimum wholesale prices, they would buy milk from out-of-state dealers if they offered lower prices. In addition to underscoring out-of-state dealers' ability to compete based on factors other than price, the Court emphasized that thirty-three percent of the milk sold by dealers in the Commonwealth was marketed pursuant to state-approved service contracts dubbed "tolling agreements," which allow dealers to sell at prices below the wholesale floors, and that approximately seven percent of overall fluid milk sales in Pennsylvania are made by out-of-state dealers participating in tolling agreements. Id. With this analytical context, the Court concluded that no reasonable jury could find the price floors failed the Pike test. Id.  at 624.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. SS 1331, 1332, and 1343. We have jurisdiction under 28 U.S.C. S 1291.

We review the District Court's grant of summary judgment de novo. Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 566 n.3 (3d Cir. 2002). Summary judgment was proper if, viewing the record in the light most favorable to Cloverland, there is no genuine issue of material fact and the Board is entitled to judgment as a matter of law.12 Fed.

_____

12. The standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief. See Fed. R. Civ. P. 57; Simler v. Conner, 372 U.S. 221, 222 (1963); Gen. Comm. of Adjustment, United Transp. Union v. CSX R.R., 893 F.2d 584, 586, 589 (3d Cir. 1990).

11

R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322– 23 (1986); Bailey v. United Airlines, 279 F.3d 194, 198 (3d Cir. 2002). A factual dispute is material if it"bear[s] on an essential element of the plaintiff 's claim," and is genuine if "a reasonable jury could find in favor of the nonmoving party." Abraham v. Raso, 183 F.3d 279, 287 (3d Cir. 1999) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248– 251 (1986)).

III. Minimum Wholesale Prices

A. The Basic Analytical Framework

In addition to granting Congress the power "to regulate Commerce . . . among the several States," U.S. Const. art. I, S 8, cl. 3, the Commerce Clause has a negative aspect (commonly called "the dormant Commerce Clause") that limits the states' power to regulate interstate commerce. The dormant Commerce Clause prohibits the states from imposing restrictions that benefit in-state economic interests at out-of-state interests' expense, thus reinforcing "the principle of the unitary national market."[13] West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 192-93 (1994). Axiomatic in dormant Commerce Clause jurisprudence is the principle that a state cannot impede free market forces to shield in-state businesses from out-of-state competition. See, e.g., Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 377 (1964) ("[T]he State may not, in the sole interest of promoting the economic welfare of its dairy farmers, insulate [its] milk industry from competition from other States."); H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 532 (1949). Thus state laws that discriminate against out-of-state businesses by forcing them to "surrender

_____

13. Congress can authorize states to impose restrictions that the dormant Commerce Clause would otherwise forbid. See, e.g., Shamrock Farms Co. v. Veneman, 146 F.3d 1177, 1180, 1182 (9th Cir. 1998) (upholding California's milk composition standards and pooled minimum producer price scheme because Congress expressly immunized the State's milk regulations from dormant Commerce Clause scrutiny); see also Norfolk S. Corp. v. Oberly, 822 F.2d 388, 392-93 (3d Cir. 1987). The Board does not maintain that Congress authorized Pennsylvania to impose wholesale price floors.

12

whatever competitive advantages they may possess" are especially suspect. Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 580 (1986).

The initial question in a dormant Commerce Clause case is whether the state regulation at issue discriminates against interstate commerce "either on its face or in practical effect." Maine v. Taylor, 477 U.S. 131, 138 (1986); Harvey & Harvey, Inc. v. County of Chester, 68 F.3d 788, 797 (3d Cir. 1995). If so, heightened scrutiny applies. "Discrimination against interstate commerce in favor of local business or investment is per se invalid, save in a narrow class of cases in which the [State] can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 392 (1994); Juzwin v. Asbestos Corp., 900 F.2d 686, 689 (3d Cir. 1990). On the other hand, if the state regulation does not discriminate against interstate commerce, but "regulates even-handedly" and merely "incidentally" burdens it, the regulation will be upheld unless the burden is "clearly excessive in relation to

the putative local benefits." Pike, 397 U.S. at 142; Harvey & Harvey, 68 F.3d at 797.

When a facially neutral law has the effect of disproportionately burdening out-of-state interests, it can be difficult to determine whether the burden rises to the level of discrimination against interstate commerce. See Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 579 (1986); General Motors Corp. v. Tracy, 519 U.S. 278, 298 n.12 (1997). Indeed, sometimes the distinction between state laws subject only to Pike balancing and those that are nearly per se invalid is "hazy." Norfolk S. Corp. v. Oberly, 822 F.2d 388, 400 n.18 (3d Cir. 1987). However, as explained in more detail below, it is clear that state laws that are facially neutral but have the effect of eliminating a competitive advantage possessed by out-of-state firms trigger heightened scrutiny. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1977); Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511 (1935).

In this case, Cloverland argues for heightened scrutiny, but disclaims any contention that the Milk Law is facially discriminatory. Thus we must consider whether a

13

reasonable jury could find that the minimum wholesale prices have the effect of discriminating against out-of-state dealers.

B. Heightened Scrutiny

Two Supreme Court decisions guide our discussion. In the leading case of Baldwin, the Supreme Court struck down a New York law prohibiting in-state dealers from selling milk purchased outside the State at a price below the New York minimum. 294 U.S. at 521. The law was challenged by a company that bought lower-cost milk in Vermont and shipped it by rail to New York for sale there. Id. at 518, 520. The Court said the law was the functional equivalent of a tariff. Id. at 521. It eliminated Vermont farmers' competitive advantage of producing milk at lower costs, id. at 522, and thus "neutralize[d] the economic consequences of free trade among the states." Id. at 526. Further, if imitated by other states, it could spark a destructive interstate trade war. Id. at 521-22. "If New York, in order to promote the economic welfare of her farmers, may guard them against competition with the cheaper prices of Vermont, the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation." Id. at 522. While New York contended that the law was an innocuous effort to ensure an adequate supply of wholesome milk, the Court explained that any protectionist law can be couched in non-protectionist terms, and that upholding state-imposed trade barriers simply because they save suppliers from market forces would render the dormant Commerce Clause a nullity.14 Id. at 523.

Four decades later, the Supreme Court invalidated a

_____

14. The defendants claim that Baldwin does not apply because New
York's law effectively regulated transactions that occurred outside the
State's jurisdiction, whereas the Milk Law applies only to in-state
transactions. But the problem with the law invalidated in Baldwin was
not merely its extraterritorial reach, but that it had the practical effect
of discriminating against out-of-state milk producers by eliminating their
competitive advantage. See Donald H. Regan, The Supreme Court and
State Protectionism: Making Sense of the Dormant Commerce Clause, 84
Mich. L. Rev. 1091, 1247-50 (1986).

North Carolina statute that prohibited closed containers of
apples sold in the State, regardless of their origin, from
displaying any grade other than that of the United States
Department of Agriculture ("USDA"). Wash. State Apple,
432 U.S. at 349-54. The statute prevented apple growers
from the State of Washington, which imposed especially
strict inspection and quality standards, from using the
superior Washington grade to market their product. Id. at
336-39. The Supreme Court determined that the labeling
rule was subject to heightened scrutiny because it had the
"practical effect" of discriminating against Washington
apples in three ways. Id. at 350-51. First, it forced
Washington apple growers and dealers--but not their North
Carolina counterparts--to change their marketing practices.
Id. at 351. Second, it eliminated the competitive advantage
that the Washington grade gave that State's apples by
requiring them to be marketed under the "inferior" USDA
grade. Id. at 351-52. Third, it had "a leveling effect which
insidiously operate[d] to the advantage of local apple
producers," giving "the North Carolina apple industry the
very sort of protection against competing out-of-state
products that the Commerce Clause was designed to
prohibit." Id. The Court rejected North Carolina's claim that
the statute was necessary to avoid the "deception and
confusion" ostensibly resulting from different states'
grading systems, noting, inter alia, that it increased these
dangers by allowing apples to be marketed without any
grade, thereby depriving purchasers of information about
the quality of apples concealed from view by closed
containers.15 Id. at 353-54.

The Supreme Court's opinions in Baldwin and
Washington State Apple show that if a state regulation has
the effect of protecting in-state businesses by eliminating a

_____

15. Before Washington State Apple, a three-judge district court concluded
that minimum wholesale prices for in-state sales do not offend the
dormant Commerce Clause, but did not consider whether the result
would be different if out-of-state dealers were disproportionately
burdened. See Baxley v. Ala. Dairy Comm'n, 360 F. Supp. 1159, 1165
(M.D. Ala. 1973); see also Schwegmann Bros. Giant Super Mkts. v. La.
Milk Comm'n, 365 F. Supp. 1144, 1156 (M.D. La. 1973) (same in dicta),
aff 'd, 416 U.S. 922 (1974) (mem.).

competitive advantage possessed by their out-of-state counterparts, heightened scrutiny applies. See Laurence H. Tribe, American Constitutional Law S 6-8, at 1076 (3d ed. 2000) ("[J]ust as it was impermissible in Baldwin v. Seelig for New York to eliminate the price advantage of Vermont milk by mandating a minimum price, so, too, in Hunt v. Washington State Apple Advertising Commission, was it impermissible for North Carolina to eliminate the quality advantage of apples from Washington by proscribing Washington's use of a quality grading system that distinguished its apples from the local product.").

We believe that a reasonable trier of fact could find that Pennsylvania's minimum wholesale prices eliminate a competitive advantage enjoyed by out-of-state dealers like Cloverland, and thus have an effect indistinguishable from the protectionist effects deemed fatal in Baldwin and Washington State Apple. We therefore hold that the District Court erred by declining to subject the wholesale price floors to heightened scrutiny.

As noted above, there is a factual dispute over why Cloverland can profitably sell milk at prices well below Pennsylvania's wholesale floors. One conclusion that a reasonable trier of fact could reach is that out-of-state dealers have a competitive advantage over their in-state counterparts. Higher raw milk costs necessitate higher wholesale prices. Because dealers buy milk from local dairy farmers, dealers from a state that imposes "over-order" prices are at a disadvantage when exposed to competition from dealers whose home states do not prop up milk producers' prices above the federal floors. Unlike neighboring states such as Maryland, where Cloverland is based, Pennsylvania forces its dealers to pay "over-order" prices for raw milk. A reasonable trier of fact could find that out-of-state dealers' ability to acquire raw milk at lower costs gives them a competitive edge over Pennsylvania dealers.16

---

16. Quite different considerations were involved in Milk Control Board of Pennsylvania v. Eisenberg Farm Products, 306 U.S. 346 (1939), where a Pennsylvania dealer who bought milk from farmers in his neighborhood and sold it in New York challenged the Commonwealth's minimum

The District Court acknowledged that a reasonable trier of fact could find that the minimum wholesale prices reduce the flow of out-of-state milk into Pennsylvania by preventing "[m]ore efficient out of state firms with lower costs . . . from utilizing their competitive advantage and attracting new customers by offering milk at lower prices." 138 F. Supp. 2d at 610. Nonetheless the Court determined that heightened scrutiny did not apply because the same

burden applies to all non-incumbent dealers, including more efficient in-state dealers. Id. at 607; see also Sch. Dist. of Philadelphia v. Pa. Milk Mktg. Bd., 683 A.2d 972, 977 (Pa. Commw. Ct. 1996) (relying on this rationale to uphold minimum wholesale prices as applied to public schools' milk purchases). However, it is not clear that the more efficient in-state dealers postulated by the District Court actually exist. The Pennsylvania Milk Dealers fervently support the minimum wholesale prices, and there is no indication that any Pennsylvania dealer objects to them. In any event, even if there were evidence that some in-state dealers would like to compete for business in Pennsylvania by offering prices below the wholesale floors, a reasonable trier of fact could find that out-of-state dealers' ability to acquire cheaper raw milk gives them a competitive

_____

producer prices. Id. at 349-50. The Supreme Court upheld the price floors, emphasizing that they affected only "essentially local" transactions between in-state producers and dealers, and did not attempt to regulate the prices at which out-of-state businesses bought or sold milk. Id. at 352. Further, the minimum prices had virtually no effect on interstate commerce because "[o]nly a small fraction of the milk produced by farmers in Pennsylvania [was] shipped out of the Commonwealth." Id. at 353. Unlike the wholesale price floors at issue in our case, the law in Eisenberg imposed only an "indirect" burden on interstate commerce, Polar Ice Cream, 375 U.S. at 378, affected "an essentially local activity," id., and did not have "the practical effect of curtailing the volume of interstate commerce to aid local economic interests." H.P. Hood & Sons, 336 U.S. at 530-31; cf. Highland Farms Dairy v. Agnew, 300 U.S. 608, 614-16 (1937) (rejecting dormant Commerce Clause challenge to Virginia's milk and cream price floors because they expressly exempted interstate commerce); Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Resources, 232 F.3d 8, 21 (1st Cir. 2000) (holding that Maine may impose minimum producer prices that apply only to in-state dealers' purchases).

17

advantage over the most efficient in-state dealers, and that the price floors eliminate this advantage.

But the flaw in the District Court's reasoning is more fundamental. The Court believed that a state may remove a competitive advantage possessed by out-of-state firms if some in-state firms are also adversely affected. As we noted several years ago, however, the Supreme Court's decision in C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383 (1994), "explicitly rejected the argument that a disputed statute would have to favor all in-state businesses as a group--a statute may be invalid if it favors only a single or finite set of businesses." Harvey & Harvey , 68 F.3d at 798. In Carbone, a town claimed that its flow control ordinance, which mandated that all solid waste produced within its borders be processed by a designated local facility, did not discriminate against out-of-state facilities because it burdened all in-state facilities save the favored one. Carbone, 511 U.S. at 390-91. The Supreme Court disagreed, explaining that "[t]he ordinance is no less

discriminatory because in-state or in-town processors are also covered." Id. at 391. Indeed, "that the flow control ordinance favor[ed] a single local proprietor," rather than local interests generally, "just ma[de] the protectionist effect of the ordinance more acute." Id. at 392. Similarly, if the wholesale price floors protect incumbent in-state dealers not only from out-of-state competitors, but also from in-state ones (as the District Court conjectured), that simply exacerbates their protectionist effect.

In sum, a reasonable jury could find that Pennsylvania's price floors "neutralize advantages belonging to the place of origin," Baldwin, 294 U.S. at 527, and"violate[ ] the principle of the unitary national market by handicapping out-of-state competitors, thus artificially encouraging in-state production even when the same goods could be produced at lower cost in other States." West Lynn Creamery, 512 U.S. at 193. If out-of-state dealers like Cloverland are able to sell milk at lower prices than the Pennsylvania dealers that currently dominate the wholesale market in Pennsylvania, a reasonable trier of fact could conclude that, by eliminating out-of-state dealers' competitive advantage, the Commonwealth's minimum

18

wholesale prices " 'cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market.' " Id. at 196 (quoting Exxon Corp. v. Governor of Md., 437 U.S. 117, 126 n.16 (1978)). This finding would trigger heightened scrutiny under Baldwin and Washington State Apple. Therefore, the District Court erred in applying the Pike balancing test at the summary judgment stage.17

If they are subject to heightened scrutiny, the wholesale price floors cannot satisfy the dormant Commerce Clause. Assuming that Pennsylvania has a legitimate interest in providing special protection for its milk supply beyond that afforded by the federal producer price floors, it can achieve its objective through alternative measures that do not discriminate against interstate commerce. For instance, the Commonwealth could encourage production by purchasing large quantities of wholesale milk from its dealers, or large quantities of raw milk from its dairy farmers. Neither action would impede out-of-state dealers' ability to compete for retailers' business, and both might be exempt from

---

17. Though not necessary to our decision, we note that the minimum wholesale prices' discriminatory effect on out-of-state dealers is compounded by the fact that they "are set by reference to operations of in-state milk dealers only." Sch. Dist. of Philadelphia v. Pa. Milk Mktg. Bd., 877 F. Supp. 245, 252-53 (E.D. Pa. 1995) (holding that the plaintiffs could establish a dormant Commerce Clause violation by showing that the Board sets minimum prices according to in-state dealers' costs); cf. New York v. Brown, 721 F. Supp. 629, 641 (D.N.J. 1989) (finding that New Jersey statute prohibiting dealers from selling milk at prices below their average total costs did not discriminate against interstate

commerce because it "set an out-of-state dealer's minimum allowable price with respect to the dealer's own costs and not with respect to those of New Jersey dealers"). By calibrating wholesale price floors for a particular milk marketing area to the operating costs of average dealers in that area, the Commonwealth enables Pennsylvania dealers to operate less efficiently without fearing losses to lower-cost competitors like Cloverland. This aspect of Pennsylvania's scheme appears to run further afoul of the cardinal rule that states may not shield in-state businesses from out-of-state competitors. See, e.g., West Lynn Creamery, 512 U.S. at 205 ("Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits.").

19

dormant Commerce Clause scrutiny under the market participant exception. See South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 93 (1984) ("Our cases make clear that if a State is acting as a market participant, rather than as a market regulator, the dormant Commerce Clause places no limitation on its activities.").

C. Pike Balancing

As explained in the preceding section, a reasonable trier of fact could find that the minimum wholesale prices have an impermissible "leveling effect" that eliminates out-of-state dealers' competitive advantage over in-state dealers. Wash. State Apple, 432 U.S. at 351. Even if no such effect is found, the record nonetheless amply supports a finding that the wholesale price floors regulate evenhandedly, but incidentally burden interstate commerce by making it more difficult for out-of-state dealers to attract new business in a market dominated by in-state dealers. Such a finding would require application of the Pike balancing test, under which the minimum wholesale prices violate the dormant Commerce Clause if the burden they impose on interstate commerce clearly outweighs their local benefits. Pike, 397 U.S. at 142. Contrary to the District Court's view, a reasonable trier of fact could conclude that the wholesale price floors fail the Pike test.

We begin with the price floors' putative benefits. The defendants insist that we must accept the Pennsylvania General Assembly's empirical judgment, expressed in the Milk Law's text, that the minimum wholesale prices help avert a milk shortage that would harm the public health. Some deference to a state legislature's asserted purpose may be appropriate when the burden of a state regulation falls on in-state as well as out-of-state interests, because in that context the state legislature's incentive to protect in-state interests "will serve as a check against unduly burdensome regulations." Kassel v. Consol. Freightways Corp. of Del., 450 U.S. 662, 675 (1981) (plurality opinion); see also Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 473 & n.17 (1981) (stating that the "major in-state interests" harmed by the challenged statute provided "a powerful safeguard against legislative abuse"). 18 "Less

18. Clover Leaf Creamery illustrates the importance of adversely affected in-state interests in dormant Commerce Clause analysis. Applying the

deference to the legislative judgment is due, however, where the local regulation bears disproportionately on out-of-state residents and businesses." Kassel, 450 U.S. at 675-76 (striking down Iowa truck-length limitations, which the State claimed promoted highway safety, under Pike); see also Tribe, supra, S 6-5, at 1053-55 (stating that courts should be more skeptical of state legislators' ostensible objectives "where a restrictive regulation affects only those from other states"). There is no evidence that any Pennsylvania dealers object to the minimum wholesale prices. Because their burden thus appears to fall only on out-of-state dealers, the purpose asserted in the Milk Law's text deserves little deference.

In any event, "the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack. Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so

_____

Pike balancing test, the Supreme Court upheld a Minnesota statute that banned the retail sale of milk in plastic non-returnable, non-refillable containers, but allowed such sales in non-returnable, non-refillable containers made of other materials. Clover Leaf Creamery, 449 U.S. at 458, 473. The statute was facially neutral, and, in contrast to the law invalidated in Washington State Apple, did not eliminate a competitive advantage possessed by out-of-state firms. Id. at 472. Nor did it otherwise discriminate against interstate commerce. Id. However, the statute incidentally benefitted some in-state firms at the expense of some out-of-state firms. Containers made of pulpwood,"a major Minnesota product," would likely be used in place of some of the banned containers, the plastic resin in which was "produced entirely by non-Minnesota firms." Id. at 473. But in the aggregate, "there [was] no reason to suspect that the gainers [would] be Minnesota firms, or the losers out-of-state firms." Id. at 472-73. Increased sales of reusable plastic bottles would offset out-of-state plastic producers' losses, and out-of-state pulpwood producers would increase their sales in Minnesota. Id. at 472-73. Further, the statute harmed "major in-state interests"--several of the plaintiffs challenging the statute were in-state firms. Id. at 473 & n.17. Finally, the "relatively minor" impediments to interstate commerce imposed by the statute were justified because it was the least burdensome means of promoting the State's "substantial" interests in conserving natural resources and alleviating solid waste disposal problems. Id. at 472-73.

substantially, as to be invalid under the Commerce Clause." Kassel, 450 U.S. at 670. Hence the inquiry is not, as the District Court thought, whether "the legislature could not have believed in the purported purpose of the statute."

138 F. Supp. 2d at 622 (emphasis added). Assuming that the General Assembly's belief was rational, the defendants cannot simply rely on the Milk Law's stated purpose. They must provide evidence that the wholesale price floors have the benefits contemplated by the General Assembly.

Only meager evidence to this effect appears in the record. The defendants offer nothing more than speculation by representatives of the Pennsylvania dairy industry that in-state milk producers would engage in predatory pricing if the Commonwealth did not impose "over-order" prices, along with the representatives' claims that the minimum wholesale prices are needed to compensate dealers for purchasing raw milk at "over-order" prices. However, a reasonable trier of fact could find that the federal producer price floors provide ample protection against predatory pricing. As the District Court said in its first opinion, the record shows that "the federal minimum pricing is ensuring an adequate supply of milk." Id. at 611. Pennsylvania is the only state in the Northeast milk marketing region that enforces wholesale price floors, yet none of the others has suffered a milk shortage in recent decades.

Moreover, the current success of the Commonwealth's dairy industry belies the defendants' claims that the minimum wholesale prices do more than artificially inflate in-state dealers' profits. At oral argument, counsel for the Pennsylvania Milk Dealers accurately noted that "Pennsylvania is one of the top, I think, top five producers of raw milk in the country. It is an exporter." As already noted, the Commonwealth ranks fourth among all states in aggregate milk production. Per-capita milk production is even more impressive--Pennsylvania produces four-and-a-half times as much milk as its residents consume. Unless eliminating the minimum wholesale prices would cause Pennsylvania's milk production to decrease so dramatically that the Commonwealth would be forced to import milk to satisfy its residents' needs--and there is no evidence that it would--a reasonable trier of fact could find that the wholesale price floors are superfluous.

22

On the burdens side of the scale, a reasonable trier of fact could find that the wholesale price floors substantially impede the flow of out-of-state milk into Pennsylvania by protecting incumbent in-state dealers from price competition. Because in-state dealers dominate the wholesale milk market in Pennsylvania, barriers to competition burden out-of-state interests more heavily than in-state ones. Price floors are a barrier especially likely to safeguard existing suppliers' market shares; a number of the retailers who provided affidavits in this case said they would switch dealers if offered prices below the floors. Preventing dealers from attracting customers by offering lower prices thus helps in-state dealers maintain their traditional hegemony.

The District Court recognized that the wholesale price

floors disproportionately burden out-of-state dealers, but concluded that there is "no conclusive evidence" of a substantial burden on interstate commerce because dealers can compete based on other criteria, such as packaging, quality, and service. 138 F. Supp. 2d at 623 (emphasis added). At the summary judgment stage, however, the non-moving party is not required to produce "conclusive" evidence. Instead, it need only offer sufficient evidence for a reasonable jury to find the facts necessary for a decision in its favor. See, e.g., Celotex, 477 U.S. at 322-23. Cloverland did that.

There is evidence that it is virtually impossible to displace incumbent dealers in Pennsylvania without offering prices below the Board-mandated floors. Not surprisingly, price seems to be an especially important factor--if not the most important factor--in retailers' decisions to find new dealers or retain their existing suppliers. Several retailers expressly ranked price as their most important criterion in deciding whether to seek new wholesale milk suppliers, and said they would switch to out-of-state dealers if they offered prices below the current minimums. Therefore, because the vast majority of incumbent dealers are in-state firms, and because there is no evidence that any in-state dealer--incumbent or not--wants to sell at lower prices, a reasonable trier of fact could find that the minimum wholesale prices place a substantial, disproportionate

23

burden on out-of-state dealers, and that the ability to compete based on non-price criteria does not noticeably alleviate the burden.[19]

Nor can we agree with the District Court that out-of-state dealers' ability to enter into tolling agreements meaningfully mitigates the burden on interstate commerce. Tolling agreements can be arranged only with the largest retailers, such as major supermarket chains. For that reason, only thirty-three percent of the milk purchased by Pennsylvania retailers is sold under a tolling agreement. The dormant Commerce Clause does not allow Pennsylvania to hamper out-of-state dealers in two-thirds of its wholesale market on the ground that they may compete freely in the remaining third. Cf. Wyoming v. Oklahoma, 502 U.S. 437, 455 (1992) (rejecting Oklahoma's claim that it could set aside a "small portion" of its coal market for in-state producers because "[t]he volume of commerce affected measures only the extent of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce").[20]

---

19. Contrast Exxon Corp. v. Governor of Md. , 437 U.S. 117 (1978), which upheld a Maryland statute prohibiting petroleum producers and refiners, none of which were based in Maryland, from operating retail gasoline stations within the State. Though the burden fell entirely on out-of-state companies, it appeared that the statute would not reduce the volume of out-of-state petroleum products sold in Maryland because producer- and

refiner-owned stations would likely be replaced by stations owned by independent out-of-state dealers. Id. at 123, 127. Unlike the Maryland statute in Exxon, which merely caused business to shift from some out-of-state suppliers to others, id. at 127-28, Pennsylvania's minimum wholesale prices protect in-state dealers from losing sales to their out-of-state counterparts.

20. Moreover, the burden on out-of-state dealers may extend to their ability to compete in their own states' wholesale markets. Cloverland introduced evidence that the minimum wholesale prices enable Pennsylvania dealers not only to maintain their in-state market shares without facing price competition from more efficient out-of-state dealers, but also to leverage their artificially inflated profits from in-state sales to undercut more efficient dealers' prices in other states. For instance, Pennsylvania dealers located in Areas 1 and 4 have offered to sell milk to Maryland retailers, including many of Cloverland's customers, at prices as much as fifteen to twenty cents per gallon less than the

24

Because the record indicates that the minimum wholesale prices may substantially burden Cloverland and other out-of-state dealers, and because there is scant evidence that the price floors advance a legitimate local interest, summary judgment would be inappropriate even if a reasonable trier of fact could not find facts sufficient to trigger heightened scrutiny.

IV. Minimum Retail Prices

We can dispense quickly with the milk consumers' challenge to the retail price floors. The dormant Commerce Clause does not prevent a state from forcing its residents to pay more for a product if no out-of-state interests are affected. The intervenor-plaintiffs presented evidence that the retail price floors harm Pennsylvania milk consumers because lower prices are available in Maryland. But they failed to present any evidence that the retail price floors burden interstate commerce by harming out-of-state interests, and thus their dormant Commerce Clause argument fails. See United Dairy Farmers Coop. Ass'n v. Milk Control Comm'n, 335 F. Supp. 1008, 1014 (M.D. Pa.) (rejecting attack on Pennsylvania's minimum retail prices where the plaintiff failed to introduce evidence that the retail price floors obstructed interstate commerce), aff 'd, 404 U.S. 930 (1971) (mem.). We note, however, that had the intevenor-plaintiffs introduced evidence that the minimum retail prices, for instance, impede out-of-state retailers' ability to compete in the Pennsylvania milk market or artificially inflate retail prices in other states (by reducing price competition among retailers within the region), the result might be different.

_____

minimum wholesale prices in Pennsylvania. Cloverland says it has lost hundreds of thousands of dollars in sales as a result.

The District Court refused to consider testimony by Cloverland employees regarding the offers made by Pennsylvania dealers, deeming it

inadmissible hearsay. However, a statement offering to sell a product at a particular price is a "verbal act," not hearsay, because the statement itself has legal effect. See Fed. R. Evid. 801 advisory committee's note; United States v. Montana, 199 F.3d 947, 950 (7th Cir. 1999); Trepel v. Roadway Express, Inc., 194 F.3d 708, 717 (6th Cir. 1999).

V. Conclusion

Genuine issues of material fact exist with respect to whether Pennsylvania's minimum wholesale milk prices interfere with "the Commerce Clause's overriding requirement of a national common market." Wash. State Apple, 432 U.S. at 350 (internal quotation marks omitted). A reasonable trier of fact could find that the wholesale price floors eliminate out-of-state dealers' competitive advantage, and that Pennsylvania could achieve its stated objectives through alternative nondiscriminatory measures. The record also supports a finding that the minimum wholesale prices' burdens on interstate commerce clearly outweigh their local benefits. Therefore, summary judgment should not have been granted with respect to the wholesale price floors, and we reverse and remand for further proceedings on that issue. We affirm the District Court's ruling with respect to the retail price floors, however, because there is no evidence that they burden interstate commerce.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit